**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0959-17T2

STAVROS, INC.,

    Plaintiff-Respondent,

v.

STATE OF NEW JERSEY,
by the COMMISSIONER OF
TRANSPORTATION,

    Defendant/Third-Party
    Plaintiff-Appellant,

v.

SOUTH STATE, INC.,

    Third-Party Defendant-
    Respondent.

_____

Submitted March 27, 2019 – Decided  September 12, 2019

Before Judges Fuentes, Vernoia and Moynihan.

On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Docket No. L-2788-13.

Gurbir S. Grewal, Attorney General, attorney for appellant (Melissa H. Raksa, Assistant Attorney General, of counsel; Fredric R. Cohen, Deputy Attorney General, on the briefs).

Duane Morris, LLP, attorneys for respondent Stavros, Inc. (Drew K. Kapur, of counsel and on the brief; Meredith E. Carpenter, on the brief).

Braff, Harris, Sukoneck & Maloof, attorneys for respondent South State, Inc. (Adam J. Kipnis, on the brief).

PER CURIAM

Defendant State of New Jersey, by the Commissioner of the Department of Transportation (DOT), appeals from the September 14, 2017 final judgment of inverse condemnation entered following a bench trial in favor of plaintiff Stavros, Inc.[1] We affirm.

I.

We discern the following facts based on the trial record and the court's findings of fact that are supported by substantial credible evidence. Stavros owned and operated "Olga's Diner" for almost fifty years on a rectangular 2.335-acre property it owned in fee simple located in Evesham Township near what was the Marlton Circle, where Route 70 and Route 73 intersected. The diner

---

[1] Defendant South State "joins in the assignment of legal errors set forth in the State's appellate brief," but does not separately appeal the trial court's judgment.

faced north toward Route 70, with Old Marlton Pike behind it on the south side, and Route 73 to the east. The property had two driveways behind the diner on Old Marlton Pike. The property did not have road frontage on Route 70 or Route 73; other parcels of land sat between it and the roads. Stavros leased the parcel between its property and Route 70 from the State from 1980 to 2009, used it for parking, and thereby had access to Route 70 through the lot's two driveways. Stavros also possessed an access driveway permit, issued by the State on April 14, 1981, which authorized Stavros to construct a driveway to Route 70. Stavros accessed Route 73 via a 1959 private easement agreement with Lahn Real Estate, which owned the lot to the east of the diner and had a permit for direct access to Route 73. In this way, the Stavros property, on which it operated the diner, had direct access to Routes 70 and 73, as well as to Old Marlton Pike.

The DOT undertook a highway construction project, the Marlton Circle Elimination Project, to reconfigure the Marlton Circle such that Route 73 would be elevated and pass over Route 70. The project included the construction of several jug handles, on and off ramps, driveway installations, modifications and removals, utility removal and modifications, and basins. The project also included the DOT's permanent fee taking of three portions of Stavros's property and a temporary fee taking of a construction easement. The permanent fee

3

takings were for Block 22.01, lots 31 and 32, lot 37 and lot 39 on the Official Tax Map of Evesham Township. The temporary fee taking was for a 6088-square-foot temporary construction easement with a right of way to enter the remaining portion of the Stavros property.

On July 30, 2004, the DOT sent Stavros a "Change of Access Letter," which proposed eliminating Stavros's Route 70 access, included a plan for reasonable alternative access, and advised that Stavros had the right to a hearing. On October 27, 2004, Stavros's counsel faxed a copy of Stavros's access driveway permit for Route 70 to the DOT. The DOT responded on January 28, 2005, stating the change in access included a permit revocation for the Route 70 access, enclosing a Revocation of Access Plan—which also eliminated Stavros's Route 73 easement access through the Lahn property—and advising Stavros of its right to a hearing.

Under the Revocation of Access plan, the DOT would construct Ramp K, which would terminate the existing direct access to the Stavros property from Route 73 but allow access by connecting the new elevated Route 73 with Old Marlton Pike. The plan provided reasonable alternative access and replaced Stavros's existing access to Route 70 with a new, shared road, Service Road M, which would connect Stavros's property with Centre Boulevard, a road to the

4

west of Stavros's property that extended from Route 70 to Old Marlton Pike. The plan required reconfiguration of Stavros's eastern Old Marlton Pike driveway and improvements to the other. Thus, the plan proposed three access points to Stavros's property: two driveways along Old Marlton Pike and one driveway to Service Road M.

In February 2005, Stavros met with DOT representatives and objected to the Revocation of Access Plan. Stavros claimed the plan revoked its state highway access without providing reasonable alternative access to the property. A meeting was held on May 5, 2005, for the purpose of exchanging information and hearing Stavros's concerns with the access design, and was attended by sixteen people, including State employees, consultants, engineers, a Deputy Attorney General, the Stavros representatives—John Stavros and his son, Tom Stavros—and their counsel. The court determined that at the May 2005 meeting, "[t]here was no discussion of terminating access to Route 70 in April 2009 or the need for any phased or staggered agreements with Stavros for implementing the new reasonable access as authorized" pursuant to N.J.S.A. 27:7-94(d).

On February 21, 2006, the DOT Commissioner issued a final access decision, which left the Revocation of Access Plan intact and described all of the proposed takings as well as construction for the reasonable alternative

A-0959-17T2

access, "but not any dates as to the closing of the Route 70 access." The DOT's final determination also provided Stavros with notice of its right to appeal to the Office of Administrative Law (OAL) if it contested the DOT's determination that the plan provided reasonable alternative access. Stavros did not appeal to the OAL and "accepted the DOT determination that the new substituted access was reasonable."

Underlying Condemnation Action

On June 12, 2008, the DOT filed a complaint for permanent and temporary condemnation of portions of Stavros's property, including temporary easements for construction of the designated reasonable alternative access "with rights to use the remainder of the Stavros property until completed." The complaint did not include a claim related to the temporary condemnation of Stavros's reasonable access property rights. The initial State appraisal for the takings alleged in the complaint was based on the assumption that the reasonable alternative access described in the Revocation of Access Plan would be provided by the DOT prior to its termination of Stavros's existing access to Routes 70 and 73 during construction of the project, and suggested $410,000 in just compensation, without any consideration of the DOT's temporary possession of the remaining land.

On September 19, 2008, the court entered an order for final judgment permitting the DOT to exercise its power of eminent domain and appointing commissioners to fix the compensation to be paid for the DOT's acquisition of Stavros's property. Stavros did not object to the order. It is not disputed that the diner closed in November 2008 for unrelated reasons.

Marlton Circle Construction Project

The DOT awarded the contract for the highway construction project to South State on March 30, 2009. On April 1, 2009, the DOT issued a letter to Stavros canceling Stavros's lease of the State-owned lot between Stavros's property and Route 70, effective April 15, 2009, because the DOT required use of the lot for the project. The court found that the DOT and South State decided to use the State's lot as South State's construction staging area for the project prior to April 1, 2009.

Route 70 Access and the April 15, 2009 Meeting

Sometime between April 1 and 15, 2009, an informal meeting took place between the DOT, South State and Stavros's representatives at the DOT's request. The meeting was not held in accordance with any statutory or administrative requirements, no prior notice of the meeting was given, and there is no official record of what occurred. However, trial testimony revealed that a

sketch of a proposed construction yard and temporary fence on the State's lot, prepared by South State "for the State," was presented at the meeting. The court inferred that "the decision to erect the fence was, at a minimum, partly the decision of the State, if not wholly, because the sketch was prepared for the State," and found credible Tom Stavros's testimony that he did not know he could object to the fence's installation and "never thought it was his place to make a decision regarding South State using the State [lot] because neither the State nor South State ever indicated he could object." The court also noted that Tom Stavros reasonably believed he had no basis to object to the construction of a fence on the property because, prior to the meeting, the State notified Stavros that it was terminating Stavros's lease for the property.

On April 15, 2009, South State moved onto the State lot and cut off Stavros's access to the Route 70 driveway by placement of a construction trailer and installation of a fence. At this time, the reasonable alternative access to the Stavros property described in the DOT's Revocation of Access Plan—through the two Old Marlton Pike driveways, Service Road M and Centre Boulevard—was not completed or open for public access. Indeed, the court determined that the reasonable alternative access described in the plan was not actually provided and available until November 2011.

8

Use of the Stavros Property and the Stavros Lease

On April 15, 2009, with the DOT's full knowledge, South State began storing its materials and vehicles on Stavros's property without Stavros's permission. While Stavros had indicated an interest in leasing the property, at that time there was no lease and South State did not have Stavros's permission to utilize the property.

From April 2009 to January 10, 2010, the DOT, through South State, occupied the Stavros property without permission and used it as a construction yard and staging area. On January 10, 2010, Stavros and South State entered into a lease allowing South State the use of the Stavros property's parking lot areas for the construction project.

As the court found, "Stavros received a rent of $23,400 for [thirty] months which both [the DOT's and Stavros's] appraisers characterize as nominal . . . ." The lease did not contain any waiver by Stavros of any claim for damages or Stavros's consent to the DOT's taking of any of Stavros's property right.

Route 73 Driveway

Stavros's easement access to Route 73 ended no later than September 2009 as a result of utility work and the construction of Ramp K. In early October, a millings ramp was installed where the prior driveway over the easement on the

Lahn property was located. There was a gate to South State's construction yard on the State's lot north of the Route 73 driveway. South State unilaterally extended the millings ramp to Stavros's property, but Stavros never requested its installation, and the court inferred that the extension "was done for the benefit of South State to access its construction yard." The court found the millings ramp was "constructed in an active construction area" and was a "temporary construction fix." Stavros's original access to Route 73 was available from April 2009 to September 2009. The court determined Route 73 access was only available via the millings road from September 2009 to April 2010, but the millings road was not for "public use."

Completion of Reasonable Alternative Access

The construction project was completed on November 4, 2011. Reasonable alternative access, as defined by the DOT in the Revocation of Access Plan, was not available at the time Stavros's access to Routes 70 and 73 ended in 2009. The court found South State's actions, which resulted in blocking Stavros's Route 70 and 73 entrances and the denial of access to these roadways, were taken with the full knowledge, understanding and supervision of the DOT. The Old Marlton Pike driveways, both existing and new, were blocked at times from October 2009 to October 2011 by cones, barricades, a metal gate, and

10

trucks. The Old Marlton Pike driveways were not completed and open for public use until November 2011. Only construction vehicles had access to Service Road M and Centre Boulevard throughout 2010, as the Traffic Control and Staging (TCS) Plans provided that those roads have road closure signs. There were not three access points to the Stavros property open to the public at all times during construction.

The court found that "[a] review of the TCS Plans and admitted documents clearly shows that the State did not intend to permit the public to utilize the reasonable alternative access construction areas before [they were] completed in November 2011." The court found the "TCS Plans provided that access to all properties and businesses was to be maintained throughout the . . . Project," and "the reasonable alternative access was to be installed prior to revoking the Access Permit and/or closing the Route 70 driveway." The court also found "the TCS Plans did not provide for a fence erected on the State Lease Property, nor did it provide for such a fence to block the access of the Route 70 driveways."

Underlying Condemnation Action

On November 23, 2010, one year before the reasonable alternative access was complete, a Commissioners' hearing was held on the DOT's underlying condemnation action. A State appraisal expert testified that, at the time of

11

writing his appraisal report, he assumed the reasonable alternative access driveways "would be in," and their construction had begun, but they were not fully completed. Another State expert testified that Stavros's Route 70 and Route 73 driveways were closed and "reasonable alternative access was not available to the Property for use of the Property as Olga's Diner as of the date of the Commissioners' Hearing." As the court has explained, "No item of damages as to the two and one half year construction period was provided to the Commissioners . . . ." Stavros objected to the omission of compensation for the loss of access to the property because the property was not usable for two and one-half years.

The DOT filed a notice of appeal from the Commissioners' award and a Demand for Jury Trial on or about December 22, 2010, and Stavros did the same on December 30, 2010.

The parties disputed the amount of just compensation owed to Stavros for the DOT's permanent and temporary takings. Stavros argued it was entitled to damages for the loss of reasonable access to the state highways. As explained by the court here, "[a]fter considerable in limine motion practice," including a third motion in limine by the DOT in which the court heard testimony from Gary Petersen, South State's General Superintendent, and Michael Lipartito, DOT

Project Engineer, "the court [in the condemnation action] ultimately severed the inverse condemnation claim from the underlying condemnation action."  The court directed Stavros to file an inverse condemnation counterclaim.

Inverse Condemnation Action

Stavros filed an inverse condemnation counterclaim on March 22, 2013. On July 24, 2013, the DOT filed an answer and a third-party complaint against its contractor, South State.  South State answered the DOT's third-party complaint on December 17, 2013.

Underlying Condemnation Jury Trial

In May 2014, a jury trial was held in the underlying condemnation action. Stavros's inverse condemnation claim, having been severed, was not presented to the jury.  On May 30, 2014, the jury awarded $998,400 to Stavros as just compensation for the value of property the DOT acquired as of June 2008, assuming alternative access and all other improvements to the Stavros property had been completed at that time.  Specifically, the jury considered the value of the fee takings and temporary taking of a 6088-square-foot work area but did not consider the impact of the DOT's takings on the rest of the Stavros property or Stavros's claim that the DOT denied its rights of reasonable access over the two and one-half years of construction.

Inverse Condemnation Bench Trial

Judge John E. Harrington conducted a bench trial on Stavros's inverse condemnation claim. Stephen Carullo, South State's Project Manager, Gary Petersen, South State's General Superintendent, Michael Lipartito, DOT Project Engineer, Jay Etzel, Urban Engineers Traffic Engineer Expert on behalf of the State, and Tom Stavros, the property owner, testified.

In a thorough, detailed and comprehensive 152-page written decision, Judge Harrington found the DOT had inversely condemned Stavros's right of reasonable access to its property from April 2009 to November 2011. The court determined that, "[f]or purposes of [its] opinion . . . South State was an agent of the State and acted in conformance with the construction specifications." The court based this determination on its finding that, throughout construction, there were always approximately ten State engineers and investigators on site inspecting the work, and "South State did not have any input in establishing the staging and phasing contained within the plans, and needed DOT approval for any change." Judge Harrington found "South State was basically charged with implementing the plans that it received from the State under the direction and control of the State's engineers and supervisors."

A-0959-17T2

The court also determined Stavros had a property right in the reasonable alternative access that the DOT specified in its Revocation of Access Plan. The court found that the reasonable alternative access—which was identified by the DOT in its 2006 plan—did not exist for a two and a half year period, from April 2009 to November 2011, and explained that the State Highway Access Management Act (SHAM Act), N.J.S.A. 27:7-89 to -98, "clearly provides that the original access is to exist until the new access is constructed." The court found the DOT "exceeded the State's police power" by revoking Stavros's access permit to Route 70 and erecting a fence preventing any access to Route 70 before providing the reasonable alternative access set forth in its plan because such action was non-compliant with the SHAM Act.

The court further found the DOT not only failed to provide reasonable alternative access in accordance with its own plan under the SHAM Act, it also:

> substantially interfered with both the general and the particularized right of reasonable access. Even if one argues there is no property right in a particularized reasonable access, the evidence in the instant case shows that the State had substantially interfered with the general right of reasonable access to a highway system and would be sufficient in and of itself.

Judge Harrington determined that without that access, Stavros could not utilize the property for its permitted commercial uses and had no choice but to

A-0959-17T2

lease it to the DOT's agent, South State, for the non-permitted use of a construction yard. The court found the Stavros property was substantially deprived of its beneficial and/or economic value for two and one-half years, thereby frustrating Stavros's investment-backed expectations because the property "could not have been used for any lawful (zoning permitted use) purpose but was in fact used as a construction yard for . . . considerably less than fair market value."

The court further determined that Stavros "clearly and convincingly established that a taking of [its] right of reasonable access occurred for a two and one[-]half year period from April 15, 2009 to November 4, 2011." Judge Harrington conducted a detailed analysis and found that, "regardless of the takings jurisprudence utilized," "[t]he State's activities require[] a takings conclusion" and thus required compensation. The court applied the Penn Central[2] factors and found a regulatory taking occurred because: there was a deprivation of substantially all of the economically viable use of the property for a two and one-half year period, the removal of two direct access points (without a new access installed) and the construction in and around the property interfered with the property owners' investment-backed expectations, and the

---

[2] Penn Cent. Transp. Co. v. New York City, 438 U.S. 104, 124 (1978).

A-0959-17T2

State action here was not for the purpose of supporting public safety, but instead merely provided its contractor a staging area, and only impacted Stavros. The court also concluded a physical taking occurred in that the DOT possessed Stavros's reasonable access by failing to provide reasonable alternative access while blocking the existing access. In addition, the court found a temporary physical invasion of Stavros's property interest of reasonable access.

The court addressed the DOT's defenses, finding Stavros did not waive any of its rights; Stavros did not consent to the DOT's actions and merely attempted to mitigate its damages by entering into a lease with South State; and there was no evidence Stavros "concealed or misrepresented its position that it was entitled to reasonable compensation for the value of the occupation of the reasonable alternative access" and no evidence of any discussion for staggered construction or deviation from the approved plans, so Stavros's inverse claim was not equitably estopped. Addressing the statute of limitations, the court found April 2009 was the earliest date on which the DOT's conduct in denying reasonable access was known and could be known to cause damage. Stavros brought its inverse claim in March 2013 and was "well within the six-year statute of limitations set forth in N.J.S.A. 2A:14-1."

A-0959-17T2

The court found that, "[a]t its simplest level, the State's failure to maintain access in accordance with the DOT 2006 reasonable [alternative] access decision as implemented through the contract specifications with respect to timing and staging requires compensation pursuant to State ex rel. Commissioner of Transportation v. Marlton Plaza Associates, L.P., 426 N.J. Super. 337 (App. Div. 2012)." The court issued an order for final judgment on inverse condemnation on September 14, 2017, concluding the DOT took Stavros's "property right of reasonable access to its property . . . without having instituted condemnation proceedings and without having paid just compensation therefore." The court found a temporary inverse taking of Stavros's property right of reasonable access from April 15, 2009, until November 4, 2011, requiring just compensation "[f]or the reasons expressed in" its written opinion.

The September 14, 2017 order further required the DOT to file its complaint for the inverse valuation proceeding, scheduled a trial for same, certified that the court's findings and conclusions as to the determination of a temporary taking from April 2009 to November 2011 were a final judgment for

purposes of appeal,[3] and retained jurisdiction over the third-party indemnification issues. The DOT appealed.

On appeal, the DOT presents the following arguments for our consideration.

POINT I

THE TRIAL COURT LACKED JURISDICTION TO REVIEW AND DECIDE STRAVROS' ACCESS CLAIMS.

POINT II

THE COURT FAILED TO APPLY THE STANDARD GOVERNING INVERSE CONDEMNATION ACTIONS.

POINT III

THE TRIAL COURT ERRED IN RELYING ON AN UNPRECEDENTED AND UNFOUNDED LEGAL THEORY.

A. The Per Se Theory Is Inconsistent with Prevailing Legal Authority.

B. The Trial Court Incorrectly Concluded That Stavros'[s] Property Interest Was Impaired.

C. The Per Se Theory Is Not Practically Possible To Implement.

---

[3] See Janicky v. Point Bay Fuel, Inc., 396 N.J. Super. 545, 550-51 (App. Div. 2007), explaining the conditions required before a trial court may certify an order as final for purposes of appeal pursuant to Rule 4:42-2.

A-0959-17T2

POINT IV

THE NJDOT'S ACTIONS DID NOT GIVE RISE TO
A VALID CLAIM FOR INVERSE CONDEMNATION
BY A REGULATORY TAKING.

A. Stavros Did Not Seek Relief From A Regulatory
Taking, And No Regulation Caused a Taking.

B. Only a Total Taking Is Recognized, and Regulatory
Taking Factors Are Absent.

POINT V

THE NJDOT'S ACTIONS DID NOT GIVE RISE TO
A VALID CLAIM FOR INVERSE CONDEMNATION
BY PHYSICAL TAKING.

POINT VI

THE COURT ERRED IN CONCLUDING THAT THE
NJDOT EXERCISED ITS POLICE POWER TO
HAVE THE FENCE ERECTED.

A. Stavros'[s] Route 70 Access Permit Can Be
Compromised.

B. The Police Power May Be Exercised Without
Compensation.

POINT VII

THE COURT ERRED IN REJECTING THE NJDOT'S
DEFENSES OF WAIVER, CONSENT, AND
EQUITABLE ESTOPPEL.

A. Stavros Waived Its Inverse Action.

A-0959-17T2

B.  Stavros's Consent to South State's Construction of the Fence and Use of the Entire Property through the Lease Bars This Inverse Action.

C. The Doctrine of Equitable Estoppel Bars This Inverse Action.

POINT VIII

BECAUSE THE NJDOT AS A MATTER OF LAW CANNOT BE HELD LIABLE FOR THE ACTIONS OF SOUTH STATE, PURSUANT TO THE NEW JERSEY TORT CLAIMS ACT, THE TRIAL COURT IMPROPERLY APPLIED AGENCY LAW.

II.

Our review of "the findings and conclusions of a trial court following a bench trial are well-established." Allstate Ins. Co. v. Northfield Med. Ctr., PC, 228 N.J. 596, 619 (2017). We review the trial court's interpretation of law de novo. Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

> [W]e give deference to the trial court that heard the witnesses, sifted the competing evidence, and made reasoned conclusions. Reviewing appellate courts should "not disturb the factual findings and legal conclusions of the trial judge" unless convinced that those findings and conclusions were "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice."

21

[Allstate Ins. Co., 228 N.J. at 619 (alteration in original) (citations omitted) (quoting Griepenburg v. Township of Ocean, 220 N.J. 239, 254 (2015)).]

We do not "engage in an independent assessment of the evidence as if [we] were the court of first instance," State v. Locurto, 157 N.J. 463, 471 (1999), and will "not weigh the evidence, assess the credibility of witnesses, or make conclusions about the evidence," Mountain Hill, LLC v. Township of Middletown, 399 N.J. Super. 486, 498 (App. Div. 2008) (quoting State v. Barone, 147 N.J. 599, 615 (1997)). "Reversal is reserved only for those circumstances when we determine the factual findings and legal conclusions of the trial judge went 'so wide of the mark that a mistake must have been made.'" Llewelyn v. Shewchuk, 440 N.J. Super. 207, 214 (App. Div. 2015) (quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007)). "If we are satisfied that the trial judge's findings and result could reasonably have been reached on sufficient credible evidence in the record as a whole, his [or her] determination should not be disturbed." Pioneer Nat'l Title Ins. Co. v. Lucas, 155 N.J. Super. 332, 338 (App. Div. 1978).

Applying these standards, we find no merit in the DOT's arguments and affirm substantially for the reasons set forth in Judge Harrington's well-reasoned

written opinion.  <u>R.</u> 2:11-3(e)(1)(E).  Nonetheless, we address the DOT's claims of purported error.

A.

The DOT first argues the trial court lacked jurisdiction to review and decide Stavros's inverse condemnation claims.  The DOT claims this case "involves a consensual access change due to the fence construction and does not constitute any cause of action," "Stavros was obligated to prospectively protect" its interest in the availability of its Route 70 access "during the 2006 access administrative process before the [DOT]" and failed to do so, and "Stavros'[s] failure to exhaust administrative remedies . . . precludes an inverse condemnation action."

Under the Eminent Domain Act of 1971, "[t]he court shall have jurisdiction of all matters in condemnation, and all matters incidental thereto and arising therefrom . . . ."  N.J.S.A. 20:3-5.  The Fifth Amendment to the United States Constitution provides that "private property" shall not "be taken for public use, without just compensation."  This provision has been made applicable to the states through the Due Process clause of the Fourteenth Amendment.  <u>Lingle v. Chevron U.S.A. Inc.</u>, 544 U.S. 528, 536 (2005).  The New Jersey Constitution, article I, paragraph 20, and article IV, section 6,

23

paragraph 3, also protect against governmental takings of private property without just compensation, and its protections are coextensive with that of the federal provision. Klumpp v. Borough of Avalon, 202 N.J. 390, 404-05 (2010).

The SHAM Act and the State Highway Access Management Code (SHAM Code), N.J.A.C. 16:47-1.1 to -14.1, regulate a property's access to the State's highways. The SHAM Act codifies a property owner's "right of reasonable access to the general system of streets and highways in the State" and subjects that right "to regulation for the purpose of protecting the public health, safety and welfare." N.J.S.A. 27:7-90(e). The DOT Commissioner has authority to issue and revoke access permits for the construction or removal of driveways onto State highways. N.J.S.A. 27:7-92(a) and -94(a).

However, before the Commissioner may revoke an existing access permit, the Commissioner must first find that "alternative access," N.J.S.A. 27:7-94(c), is or will be available to the property and that revoking the existing access permit serves the purposes of the Act, N.J.S.A. 27:7-94(a). The Act provides for written notice to the property owner as well as an opportunity to be heard. Ibid. The Commissioner must provide the owner "a plan depicting how . . . alternative access shall be obtained . . . and the improvements which will be provided by the department to secure the alternative means of access." N.J.S.A. 27:7-94(b).

"[A]lternative access shall be assumed to exist if the property owner enjoys reasonable access to the general system of streets and highways." N.J.S.A. 27:7-94(c).  N.J.S.A. 27:7-94(c)(1) provides that alternative access is presumptively reasonable for property zoned for commercial use if the property has access:

> [o]nto any parallel or perpendicular street, highway, easement, service road or common driveway, which is of sufficient design to support commercial traffic to the business or use, and is so situated that motorists will have a convenient, direct, and well-marked means of both reaching the business or use and returning to the highway.
>
> [N.J.S.A. 27:7-94(c)(1).]

The DOT's determination regarding reasonable alternative access "shall be final" for the purposes of appeal and binding on the property owner and the State.  N.J.S.A. 27:7-95(b).

Here, the DOT made a determination as to what constituted reasonable alternative access during the construction project, and Stavros accepted the DOT's determination.  The court, however, found as a matter of fact that the reasonable alternative access which the DOT defined in the Revocation of Access Plan was never provided to Stavros during the thirty months from April 2009 through November 2011.

A-0959-17T2

When the DOT revokes an access permit, the DOT must "provid[e] all necessary assistance to the property owner in establishing the alternative access," which includes, but is not limited to, "funding of any such improvements by the department," costs associated with relocation and removal of access drives, "on-site circulation improvements to accommodate changes in access drives," installation of traffic signs, and the "cost of any lands, or any rights or interests in lands, and any other right required to accomplish the relocation or removal." N.J.S.A. 27:7-94(d). The SHAM Act includes a limitation on the revocation of an access permit. "Until the alternative access is completed and available for use, the [existing access] permit shall not be revoked." N.J.S.A. 27:7-94(d) (emphasis added). However, the DOT and a property owner may enter into an agreement for phased development of a project providing for reasonable alternative access. Ibid.

A challenge to the DOT's determination as to the reasonable access it commits to provide in a Revocation of Access Plan would require that Stavros exhaust its administrative remedies by appealing that determination to the Commissioner. See Marlton Plaza Assocs., 426 N.J. Super. at 348-50 (explaining the procedure for appealing the revocation of an access permit). However, Stavros did not, and does not, challenge the DOT's Revocation of

Access Plan, or the reasonable alternative access the DOT determined it would provide under the plan. Instead, Stavros challenged the DOT's taking of its property interest in the alternative reasonable access the DOT said it would provide under the plan and to which Stavros was otherwise entitled. Stavros alleged the DOT failed to provide the reasonable alternative access by revoking Stavros's lease to the property over which access to Route 70 was provided under its access permit, allowing South State's construction of a fence which resulted in the denial of any access to Route 70, and other actions that resulted in no reasonable access to the property from Route 73 and Old Marlton Pike for thirty months.

The trial court made findings of fact, supported by testimony it found credible, that Stavros did not consent to, and never entered into an agreement under N.J.S.A. 27:7-94(d) permitting, a loss of its right to the reasonable alternative access expressly provided for in the Revocation of Access Plan promulgated by the DOT. Nothing in the SHAM Act required Stavros to engage in an administrative appeal to preserve its right to reasonable access under the statute and as provided in the DOT's plan. To the contrary, the SHAM Act specifically provides that, absent a clear agreement to the contrary between the Commissioner and the property owner, an existing access permit cannot be

27

revoked until alternative access is complete and available for use.[4]  N.J.S.A. 27:7-94(d).

Where the Commissioner seeks to acquire "any right of access to any highway," he or she may do so by "purchase or condemnation."  N.J.S.A. 27:7-98.  The DOT granted Stavros reasonable access under a plan the DOT promulgated and Stavros accepted, but then failed to comply not only with its own plan, but also with the statutory prohibition against revoking access until the promised reasonable alternative access was provided.  See N.J.S.A. 27:7-97(d).  As correctly found by the court, the DOT's actions resulted in no reasonable access to the Stavros property from April 2009 to November 2011, deprived Stavros of the beneficial use of its right of access and property, and constituted a de facto taking of Stavros's property for which an inverse condemnation claim lies.  See Greenway Dev. Co. v. Borough of Paramus, 163 N.J. 546, 553 (2000); see also Marlton Plaza Assocs., 426 N.J. Super. at 356 (finding that under the SHAM Act and the common law, where "access that

---

[4]  The DOT also argues in its reply brief that Stavros's inverse taking claim is time-barred under the six-year statute of limitations, N.J.S.A. 2A:14-1, because the DOT's final agency decision letter was dated February 21, 2006, and Stavros did not file its inverse affirmative pleading until March 22, 2013.  As the trial court noted, Stavros's claim concerns State actions beginning in 2009.  Thus, Stavros's claim is not time-barred.

remains following DOT regulation is not reasonable," the State is required to "acquire the property interest through condemnation"); Magliochetti v. State by Comm'r of Transp., 276 N.J. Super. 361, 371 (Law Div. 1994) (explaining that "[i]n lieu of providing reasonable alternative access when revoking a permit, 'the commissioner may acquire, by purchase or condemnation, any right of access to any highway . . . .'"). We therefore reject the DOT's arguments and find the court properly exercised its jurisdiction in deciding Stavros's inverse condemnation claim.

B.

The DOT next argues Stavros must prove its claim for inverse taking by clear and convincing evidence and prove deprivation of all or substantially all of the beneficial use of the whole property, as opposed to the loss of a "property right of reasonable access." The DOT asserts that the court failed to apply this standard because the court did not find that the loss of direct access to Route 70 constituted substantial destruction of the beneficial use of the property as a whole. Moreover, the DOT argues the court could not reach such a conclusion because the property retained two-thirds of the property's access during construction.

A-0959-17T2

We reject the DOT's arguments because they are undermined by the court's factual findings which are supported by substantial credible evidence. Contrary to the DOT's assertions, the court did not find that the April 2009 cutoff of access to Route 70 was the only interruption in access to the property. The court also determined the Route 73 access was replaced by a millings road that was not available for public access, the property's two Old Marlton Pike driveways did not remain open and available for public use throughout the construction project, that neither of the Old Marlton Pike driveways constituted the reasonable alternative access to Routes 70 and 73 set forth in the DOT's 2006 Revocation of Access Plan, and that the DOT did not provide access through Service Road M until November 2011. The DOT illogically contends that Stavros is bound by the reasonable alternative access determination set forth in the DOT's Revocation of Access Plan but that the DOT's failure to provide access in accordance with the plan and as required under N.J.S.A. 27:7-94 did not deprive Stavros of reasonable access. The trial court found that, without the reasonable access the DOT said it would provide under its plan or any other reasonable access, Stavros could not utilize the property for its permitted commercial uses and the property "could not have been used for any lawful . . . purpose" for two and one-half years.

We defer to the trial judge's findings that the Stavros property did not have reasonable access pursuant to N.J.S.A. 27:7-94(c)(1) or otherwise from April 2009 to November 2011 and the loss of reasonable access resulted in a concomitant loss of the beneficial use of Stavros's property for its permitted commercial uses during that time because both findings are supported by substantial credible evidence in the record. See Allstate Ins. Co., 228 N.J. at 619.

## C.

The DOT also contends the trial court erred in finding that the SHAM Act required the DOT to maintain Stavros's existing access until the reasonable alternative access was available. The DOT argues the court "relied on the per se theory to conclude a taking had occurred, merely due to a change in the original access, before the alternative access was complete" and repeats its earlier argument, which we have addressed and rejected, that the court ignored "a required element of the inverse condemnation review: whether, after such an access change, Stavros lost the beneficial use of the totality of its Property." The DOT contends a property owner has no right to a particular access point on his or her property under the SHAM Act.

A-0959-17T2

The trial court correctly found under the plain language of the SHAM Act that Stavros had a right to continual reasonable access during construction of the reasonable alternative access. The SHAM Act provides:

> When the commissioner revokes an access permit pursuant to this section, the commissioner shall be responsible for providing all necessary assistance to the property owner in establishing the alternative access, which shall include the funding of any such improvements by the department. Until the alternative access is completed and available for use, the permit shall not be revoked. The commissioner shall also erect on the State highway and on connecting local highways suitable signs directing motorists to the new access location. The commissioner may enter into agreements with property owners for phased development and provisions of this subsection shall not supersede any such agreements.

> [N.J.S.A. 27:7-94(d) (emphasis added).]

For a commercial property like Stavros's, alternative access exists if the property has reasonable access onto a street, road or driveway "of sufficient design to support commercial traffic . . . so situated that motorists will have a convenient, direct, and well-marked means of . . . reaching the business . . . and returning to the highway." N.J.S.A. 27:7-94(c)(1). Here, the DOT determined what constituted reasonable alternative access to Routes 70 and 73 from Stavros's property in its 2006 final Revocation of Access Plan. But, as the court found, and as the evidence shows, the DOT failed to provide the reasonable

32

alternative access the DOT defined and committed to provide, and no other reasonable access to the property was otherwise available from April 2009 to November 2011.

Although the DOT is correct that a property owner has no right under the SHAM Act to a particular access point on his or her property, N.J.S.A. 27:7-90(e), "modification or revocation of an access point" will not constitute a taking only "so long as free and reasonable access remains," Marlton Plaza Assocs., 426 N.J. Super. at 355. Here, however, the DOT made a final determination in the Revocation of Access Plan that Stavros had a right to a defined and specified reasonable alternative access. Indeed, the DOT argues its promulgation of the plan constituted a final agency decision that Stavros could challenge only by appeal to this court. Stavros did not appeal and accepted the DOT's determination and, in our view, therefore became vested with a property interest in the reasonable alternative access the DOT adopted in its final agency decision. The DOT never modified the Revocation of Access Plan to change the proposed reasonable alternative access and therefore did not afford Stavros the opportunity to appeal any proposed change to the reasonable alternative access that the DOT defined and committed to provide in its plan. See N.J.S.A. 27:7-94(c). Instead, the DOT violated N.J.S.A. 27:7-94(d) by taking actions—

revoking Stavros's access permit and allowing South Street's construction of a fence blocking access to the Stavros property from Route 70—prior to the construction of the reasonable alternative access defined in the DOT's final agency decision, the Revocation of Access Plan.  As the court found, "[t]he State should have known that by eliminating direct ingress and egress to Route 70, it was both revoking access and completing the revocation [of Stavros's access permit] process without providing the determined, accepted and required means of alternative access."

"[I]f the access that remains following DOT regulation is not reasonable, the property owner's Fifth Amendment rights are implicated . . . since lack of reasonable access would interfere with the property owner's distinct investment-backed expectations."  Marlton Plaza Assocs., 426 N.J. Super. at 356.  In Marlton Plaza Associates, on which the DOT relies, the property retained two of its original three access points to the highway, losing only one point of access.  Id. at 343-44.  The court found the remaining access was clearly reasonable.  Id. at 356.

The DOT correctly argues that a property owner is not entitled to a particular point of access, see High Horizons Dev. Co. v. Dep't of Transp., 120 N.J. 40, 48 (1990); Marlton Plaza Assocs., 426 N.J. Super. at 355, but ignores

the court's well-supported factual findings that the DOT failed to provide any reasonable alternative access—indeed any access by the public—either as specified in its plan or otherwise from April 2009 to November 2011. Reasonable access for commercial property is defined as access that "is of sufficient design to support commercial traffic to the business or use, and is so situated that motorists will have a convenient, direct, and well-marked means of both reaching the business or use and returning to the highway." N.J.S.A. 27:7-94(c)(1). The court found as a matter of fact that no such access was provided during the project. We affirm those findings because they are supported by substantial credible evidence. See Allstate Ins. Co., 228 N.J. at 619.

D.

The DOT contends Stavros did not allege a regulatory taking in its complaint, and is therefore not entitled to seek relief from a regulatory taking. The DOT is correct that Stavros's complaint did not specifically use the phrase "regulatory taking," and the court noted in its opinion that Stavros "has not requested a regulatory takings determination, but has submitted arguments supporting same." However, Stavros alleged an inverse condemnation action based on conduct arising from regulatory action in its inverse condemnation cross-claim and, given that "reasonable inferences and implications are to be

35

considered most strongly in favor of the pleader," <u>Spring Motors Distribs., Inc. v. Ford Motor Co.</u>, 191 N.J. Super. 22, 30 (App. Div. 1983), the DOT was "fairly apprise[d]," <u>id.</u> at 29, of the claim. We therefore discern no basis to conclude that the court erred by considering, in its comprehensive analysis of Stavros's taking claims, whether the DOT's actions constituted a regulatory taking.

The DOT also contends no regulation caused a taking, and regulatory taking factors are absent. In addition, the DOT argues the court erred in finding a physical taking because "a revocable access permit is not a contractual easement," Stavros leased all of its rights in its property to South State, including the right to access roadways, and the court's reliance on <u>United States v. Gerlach Live Stock Co.</u>, 339 U.S. 725 (1950), is misplaced because unlike riparian rights, "Stavros had no . . . uninterrupted property right to Route 70 access."

The court recognized the complexities attendant to conducting a regulatory takings analysis "[w]hen it is not clear whether the taking is regulatory or physical" and noted that "[t]he State activities in this case are not the typical regulatory permitting circumstance." The court found that the DOT took regulatory action in its adoption of the Revocation of Access Plan because it revoked Stavros's access permit, while substituting what it defined as reasonable alternative access as a condition of the revocation under the SHAM

Act. The court further found the DOT violated its plan by allowing its agent, South State, to erect a fence on the property barring access to Route 70, prior to providing reasonable alternative access.

The Court has "staked out two narrow categories of regulatory action that generally will be deemed per se takings." Marlton Plaza Assocs., 426 N.J. Super. at 352-53. The first category is "where government requires an owner to suffer a permanent physical invasion of her property." Id. at 353 (quoting Lingle, 544 U.S. at 538). "The second 'applies to regulations that completely deprive an owner of all economically beneficial use of her property.'" Ibid. (quoting Lingle, 544 U.S. at 538). However, as recognized by the court, under the Penn Central analysis:

> when a regulation impedes the use of property without depriving the owner of all economically beneficial use, a taking still may be found based on "a complex of factors," including (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action.
>
> [Murr v. Wisconsin, ___ U.S. ___, ___, 137 S. Ct. 1933, 1943 (2017) (citation omitted).]

A property owner must establish more than "lost economic opportunities, forgone financing, and diminution in market value" to satisfy the economic

37

impact prong. <u>Littman v. Gimello</u>, 115 N.J. 154, 164 (1989). The owner must demonstrate the regulation "'substantially destroys the beneficial use of private property,' or does not allow an 'adequate' or 'just and reasonable' return on investment." <u>Karam v. Dep't of Envtl. Prot.</u>, 308 N.J. Super. 225, 236 (App. Div. 1998) (quoting <u>Gardner v. N.J. Pinelands Comm'n</u>, 125 N.J. 193, 211 (1991)).

In addition, the property owner's investment-backed expectations must be reasonable. <u>E. Cape May Assocs. v. Dep't of Envtl. Prot.</u>, 300 N.J. Super. 325, 337 (App. Div. 1997). "Whether or not expectations are considered reasonable will depend to a significant extent on whether the property owner had notice in advance of its investment decision that the governmental regulations which are alleged to constitute the taking had been or would be enacted." <u>Ibid.</u>

Here, the court conducted a detailed analysis of the <u>Penn Central</u> factors and found the DOT's regulatory action, exceeding its regulatory authority under the SHAM Act by revoking Stavros's access permit without providing the reasonable alternative access required under the plan and N.J.S.A. 27:7-94(d), effectively deprived Stavros of all economically beneficial use of its property for two and one-half years.

In Washington Market Enterprises v. City of Trenton, the Court noted "[t]he general question as to when governmental action amounts to a taking of property has always presented a vexing and thorny problem," which has led to seemingly inconsistent results. 68 N.J. 107, 116 (1975). The Court determined that although the City of Trenton's "declaration of blight" of a redevelopment area, "in and of itself, [did] not constitute a taking," a taking can occur where "in addition to the declaration . . . other related activities . . . are said to have shorn property of literally all or most of its value." Id. at 115. The court made its regulatory taking determination based on a similar finding here. We decline to reward the DOT for exceeding its authority under the SHAM Act by finding there is no regulatory taking where its regulation by promulgation of the Revocation of Action Plan and failure to provide any reasonable access during the construction project resulted in Stavros's loss of the beneficial use of its property.

The trial court properly found a taking under its analysis of the Penn Central factors. The court determined a regulatory taking occurred because Stavros was deprived of substantially all of the economically viable use of the property for two and one-half years, the lack of reasonable access and the construction around the property interfered with Stavros's investment-backed

A-0959-17T2

expectations, and the DOT's actions were not designed to support public safety, but instead merely provided its contractor with a staging area, and only impacted Stavros. "[W]e are satisfied that the trial judge's findings and result could reasonably have been reached on sufficient credible evidence in the record as a whole," and the "determination should not be disturbed." Pioneer Nat'l Title Ins. Co., 155 N.J. Super. at 338.

E.

The DOT contends Stavros failed to object and/or consented to the installation of the fence on the State lot through which access to Route 70 had previously been provided, thus the DOT never exercised its police power in permitting South State to erect the fence around the State lot between Stavros's property and Route 70, cutting off Stavros's access to the highway. In the alternative, the DOT claims that even if it did exercise its police power in allowing the fence, its exercise was "lawful and explicitly authorized." The DOT contends Stavros's Route 70 permit authorizes access changes during construction, and the property always had reasonable access after South State erected the fence that blocked access to Route 70.

The court found, and we agree, that the Stavros property did not enjoy reasonable access throughout the construction period and the DOT's actions

violated the statutory requirements in N.J.S.A. 27:7-94(d). The DOT provides no citation to any legal authority supporting its contention that the terms of the April 1981 Route 70 permit supersede the substantive and procedural requirements of the SHAM Act. The court found, based on testimony from Tom Stavros that it found credible, that Stavros did not consent to the construction of a fence that barred access to Route 70 because the fence was not indicated on the map of the property shown to him, and that he did not know Stavros could object to the fence because the meeting at which the fence was referenced followed the DOT's notice of termination of Stavros's lease for the property. We will "not weigh the evidence, assess the credibility of witnesses, or make conclusions about the evidence," Mountain Hill, LLC, 399 N.J. Super. at 498 (quoting Barone, 147 N.J. at 615), and defer to the trial judge's fact-finding, which undermines the DOT's assertion that Stavros consented to installation of the fence in a manner resulting in a waiver of its claim that barring its access to Route 70 without providing reasonable alternative access resulted in a taking of its right to reasonable access during the construction project.

F.

The DOT argues the trial court erred in rejecting its defenses of waiver, consent and equitable estoppel. The DOT claims Stavros waived its inverse

41

condemnation claim by not filing an administrative appeal of the 2006 access determination, failing to "veto the fence" at the informal April 2009 meeting, leasing its property to South State, and failing to file suit to remove the fence. The DOT further claims this inverse action is barred because Stavros consented to the fence and use of its entire property through its lease of the property to South State for use as a construction yard. The DOT also argues equitable estoppel bars this action because the DOT and South State relied on Stavros's consent to the fence, loss of its Route 70 access, and South State's use of the State lot through Stavros's lease with South State. In addition, the DOT contends the trial court improperly applied agency law in the analysis of the DOT's responsibility for the actions of South State because the New Jersey Tort Claims Act, N.J.S.A. 59:1-1 to 12-3, bars the imposition of liability against the State, except as provided by the Act, "for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person." N.J.S.A. 59:2-1. In the alternative, the DOT argues South State was an independent contractor, not an agent, for whose actions the DOT cannot be held liable.

We have considered these arguments and find they are without sufficient merit to warrant discussion in a written opinion, R. 2:11-3(e)(1)(E). We thus

A-0959-17T2

affirm same substantially for the reasons stated in Judge Harrington's written opinion.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0959-17T2